FILED

2020 Dec-22  AM 09:10
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

|  |  |  |
|---|---|---|
| ALPHONSIA SOMMERVILLE, III, | ) | |
| Plaintiff, | ) | |
| v. | ) | 7:19-cv-00079-LSC |
| WARRIOR MET COAL MINING, LLC, | ) | |
| Defendant. | ) | |

## Memorandum of Opinion

Alphonsia Sommerville is an African-American male who worked for Warrior Met Coal Mining (WMC) in Brookwood, Alabama. Over a sixteen-month period he complained about several coworkers wearing or carrying an image of the Confederate flag. Although he never heard a coworker or supervisor use a racial slur, and although he never saw other offensive insignias at work, he believes the Confederate flag created a hostile work environment. He also believes WMC suspended and terminated him in retaliation for his complaints. WMC moved for summary judgment. For the reasons explained below, summary judgment is due to be granted.

I.     Facts[1]

WMC produces and exports metallurgical coal. (Doc. 37-1 at ¶ 3.) Its company policies prohibit unsafe conduct and the destruction of company property. (Doc. 37–3 at 75–90.) Its employee handbook forbids the "display of discriminatory or sexually suggestive posters, cartoons, drawings, screen savers, images, or objects" and prohibits retaliation "against anyone for making a good faith complaint." (*Id.* at 90.) Alphonso Sommerville joined WMC as a union-member employee on September 15, 2016. (Doc. 37–2 at 151.) He operated heavy machinery like trucks and bulldozers. (*Id.* at 157.)

Three months into the job, Sommerville saw coworker Chris Vance wearing a Confederate flag sticker on his hard hat. (Doc. 37–8, Ex. 5 at 5.) Believing Vance's sticker violated WMC's policy against discriminatory images, Sommerville complained to Human Resources Manager Sherry Sterling. (Doc. 37-2 at 308-09; Doc. 37-8 at 31–32.) Sterling confronted Vance and made him either remove or cover the sticker. (Doc. 37-8 at 51–53; Doc. 37-9 at 57-59.)

Over the next sixteen months Sommerville complained to WMC management at least three times about coworkers wearing or displaying the flag. In March 2017 he

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

complained that Kyle Kennedy had a Confederate flag sticker on his hard hat. (Doc. 37-2 at 313–19; Doc. 37-8 at 53–55.) Sterling told Kennedy to cover the sticker. (Doc. 37-2 at 332; Doc. 37-8 at 54.) In October 2017 he complained that Chris Vance again had a Confederate flag sticker, this time on his lunch box. (Doc. 37-8, Ex. 5 at 5–6.) Just as she did the first time, Sterling investigated and confronted Vance. (Doc. 37-8 at 47–48.) When Sommerville complained in April 2018 that yet another employee had a Confederate-flag-adorned hard hat, Sterling verbally warned that employee and told him to change hats. (Doc. 37-8 at 59–60; Doc. 37–11 at 10.)

Sommerville testified that he complained about three other coworkers, all for the same reason. (Doc. 37-2 at 353–366.) Although Sterling denies ever hearing those three complaints (*see* Doc. 37-8 at 5–6), all parties agree Sommerville's final complaint came sometime in April 2018. (Doc. 37-2 at 484–85.) WMC disciplined Sommerville weeks after that final complaint. (*Id.* at 190–91.) A conveyor belt carries rocks and other waste from the mine and drops it at a refuse pile. That pile grows unless someone moves the rocks as quickly as they fall. On April 18, 2018, Sommerville was managing the pile with a bulldozer. (*Id.* at 369–70.) Around 2:30 AM he dug a hole next to the conveyor belt so rocks would fall from the belt into the hole and not into the growing pile. (*Id.* at 370–71.) Steve Wright, working alongside Sommerville in a separate dozer, thought Sommerville's hole was a safety hazard.

(Doc. 37-12 at 14–15), so Wright radioed his supervisor and asked for help. The supervisor told Wright to fill in the hole and "handle" the hazard. (*Id.*) What happened next is disputed. According to Sommerville, he and Wright had a pushing match:

> [Wright] started picking at me, pushing rock over into the [hole]. So I didn't do anything. I cleaned the [hole] back out again . . . And he started again . . . After he done that the second time, I took the rock that he pushed on me because he is doubling my work, and I pushed it back on his side. So he was trying to push my side, and we both were pushing. The dozer blades touched.

(Doc. 37-2 at 370.) Wright remembers more than blades accidentally "touching." According to him, Sommerville violently rammed and damaged Wright's dozer. (Doc. 37-12 at 14–21.) Wright complained to Barry Frederickson, Frederickson investigated, and he "determined that Mr. Wright's version of the events that took place was more credible than Mr. Sommerville's." He further determined that "Mr. Sommerville's actions placed himself, his coworkers, and company property in serious danger." (Doc. 37-1 at ¶¶ 37–38.) With these findings, Frederickson suspended Sommerville with the intent to terminate him. (*Id.*)

Under a collective bargaining agreement between WMC and the United Mine Workers of America, any terminated employee can "immediately" appeal to an arbitrator. (Doc. 37-4 at 52.) The arbitrator hears the appeal within five days and issues a written decision within ten days of the hearing. (*Id.*) "If the arbitrator

determines that [WMC] has failed to establish just cause for the Employee's discharge, the Employee shall be immediately reinstated to his job and afforded any lost earnings and benefits determined to be appropriate by the arbitrator. If the arbitrator determines that there was just cause for the discharge, the discharge shall become effective upon the date of the arbitrator's decision." (*Id.*)

Consistent with the WMC-UMWA agreement, Sommerville appealed his termination to an arbitrator. The arbitrator generally agreed with Wright. He found (1) that Sommerville did more than "tap" Wright's dozer, (2) that Sommerville acted intentionally, (3) that Sommerville threatened Wright's safety. (Doc. 37-5 at 27.) But he also found mitigating factors: this was Sommerville's first formal discipline, the incident didn't "significantly" undermine the mine's productivity, and the dozer-ramming caused no "substantial" property damage. (*Id.*) All things considered the arbitrator found termination was too severe a penalty. (*Id.* at 28.) He reduced Sommerville's punishment to a sixty-day suspension without pay. (*Id.*) Sommerville served his suspension and returned to work on June 18, 2018. (Doc. 37-2 at 409.)

Roughly four weeks later Sommerville and Wright had yet another disagreement. According to Wright, Sommerville "darted" in front of his vehicle as he exited the WMC parking lot. (Doc. 37-12 at 51.) This allegedly forced Wright to

swerve and almost hit another car. (*Id.* at 117.) Wright complained to Sterling. (Doc.

37-8 at 112.) Sterling investigated, but she found no evidence to either validate or

invalidate Wright's allegation. (*Id.* at 113.)

The next incident happened on August 11, 2018. As Wright drove out of the

WMC parking lot he once again nearly hit a walking Sommerville. (Doc. 37-12 at 57–

61.) But unlike the incident three weeks earlier, a witness allegedly saw the August

11 near-collision. (*Id.*) The witness told Wright what he saw, Wright relayed that

information to Frederickson, Frederickson investigated, and Frederickson found the

following:

> 50. The footage from the parking lot's surveillance camera showed Mr.
> Sommerville walking on the perimeter of a line of parked cars . . . and
> then abruptly stepping out in front of Mr. Wright's car right as [Wright]
> passed by Mr. Sommerville.
>
> 51. Following my personal review of the footage of the incident, I
> determined that Mr. Sommerville intentionally stepped out in front of
> Mr. Wright's moving vehicle in the UMWA parking lot. I determined
> this dangerous action was deliberate and intentional based on a number
> of factors, including, but not limited to: (i) my review of the footage, (ii)
> Mr. Wright's demeanor while reporting the incident, (iii) Mr. Wright's
> prior complaint alleging the exact same conduct by Mr. Sommerville,
> and (iv) the history of animosity in the workplace between Mr.
> Sommerville and Mr. Wright.

(Doc. 37-1 at ¶¶ 49–51.)

After his investigation, Frederickson again suspended Sommerville with the intent to terminate him. (*Id.* at ¶ 52.) Sommerville again appealed to an arbitrator. This time the arbitrator upheld Frederickson's decision:

> I viewed the video evidence several times carefully. I observed [Sommerville's] gate and manner of walking prior to the incident and during the incident. I observed the speed of Wright's vehicle. I observed the speed of [Sommerville's] walk. As Wright's vehicle approaches, [Sommerville] turns to his left suddenly and . . . "quickens his step" . . . causing Wright to hit his brakes and his vehicle to swerve to the left. Wright came very close to hitting [Sommerville] with his vehicle . . . [Sommerville] initiated the incident. [Sommerville] had the last clear chance to avoid the incident.

(Doc. 37-6 at 23.) Based on the "significant danger of injury or property damage" caused by Sommerville, WMC "met its contractually required burden of proof of showing just cause for [his] discharge." (*Id.* at 23–24.)

According to Sommerville, both the April suspension and the August termination had a surreptitious motive: WMC did not like him complaining about the Confederate flag. Both were retaliatory, he argues. He therefore sued WMC under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and under 42 U.S.C. § 1981.

II.   Standard of Review

A successful motion for summary judgment shows there is no genuine dispute as to any material fact and that the movant deserves judgment as a matter of law.

Fed. R. Civ. P. 56(a). Summary judgment is not appropriate if "the nonmoving party has produced such evidence that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2009)). At the summary judgment stage, trial courts do not weigh evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We instead view all evidence and draw all justifiable inferences in the non-moving party's favor. *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1383 (11th Cir. 1990). Then we determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

III.   Hostile Work Environment

A.   Sommerville Pled a Hostile Work Environment Claim

The parties disagree about whether Sommerville even pled a hostile work environment claim, and the Court sees the source of confusion: Sommerville's complaint does not set each claim out in an individual count. It instead lumps every claim and every fact for every claim under one heading. That's a problem. *See Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1322–23 (11th Cir. 2015). According to WMC, that problem is so severe it turns Sommerville's complaint into

an impermissible "shotgun pleading"—one "calculated to confuse the enemy" and "prejudice an opponent's case." *T.D.S. Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1543 n.14 (Tjoflat, J., dissenting).

Sommerville's complaint is not a shotgun pleading for one reason: it gave WMC notice of Sommerville's hostile work environment claim. "The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* at 1323. That was not the case here. Sommerville's complaint used the phrase "hostile work environment" at least five times. It used the phrase "racially hostile Confederate flag" once. Taken alongside the allegations of Confederate flags at the workplace, those phrases gave WMC adequate notice of Sommerville's hostile work environment claim and adequate notice of the "grounds upon which that claim rests." *See Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 648 (7th Cir. 2011) (citing *Watson v. CEVA Logistics U.S., Inc.*, 619 F.3d 936, 938–39 (8th Cir. 2010) ("[W]e agree that displays of confederate flags in the workplace may support a hostile work environment claim."). And even if his complaint were a shotgun pleading, this issue should have been addressed before dispositive motions. *Weiland*, 792 F.3d at 1323 n.13.

Sommerville adequately pled a hostile work environment claim under Title VII and § 1981. Whether that claim survives summary judgment is a separate question.[2]

      B.   Sommerville Did Not Submit Evidence of An Objectively Hostile Work Environment.

"[W]hen the workplace is permeated with [racially] discriminatory intimidation, ridicule, and insult[] that is sufficiently severe or pervasive enough to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The same is true for § 1981. *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1300 (11th Cir. 2010). For both statutes, the plaintiff must show five elements: "(1) that he is a member of a protected class; (2) that he was subjected to unwelcome racial harassment; (3) that the harassment was based on his race; (4) that the harassment was severe or pervasive enough to alter the terms and conditions of his employment and create a

---

[2] According to Sommerville, WMC never moved for summary judgment on his hostile work environment claim. (Doc. 43 at 24) ("Defendant has not addressed Plaintiff's racially hostile work environment in their brief . . ."). The Court rejects that argument for two reasons. First, WMC moved "for complete summary judgment." (Doc. 35 at 1.). Complete summary judgment includes Sommerville's claim for hostile work environment. Second, and more importantly, WMC's summary-judgment motion fully briefed the hostile work environment issue. It discussed the binding case law, Sommerville's allegations, and why those allegations—even if true—do not rise to an actionable claim. Sommerville's brief then responds to those arguments. The motion for summary judgment as to Sommerville's hostile work environment claim is ripe for review.

discriminatorily abusive working environment; and (5) that the employer is responsible for the environment under a theory of either vicarious or direct liability." *Adams v. Austal, U.S.A., LLC*, 754 F.3d 1240, 1248–49 (11th Cir. 2014) (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)). WMC mainly challenges element four. (Doc. 46 at 11–14.) Element four has both a subjective and an objective component. *Harris*, 510 U.S. at 21. The plaintiff must subjectively perceive his work environment to be abusive. *Id.* at 21–22. He also must show the racial harassment was objectively severe or pervasive enough to alter the terms and conditions of his employment. *Id.*

Sommerville's claim satisfies the subjective component of element four. He complained at least four times about his coworkers wearing or displaying the Confederate flag. He testified to how the Confederate flag "bothers" him because "it's one of the most racist symbols in the United States of America." (Doc. 37-2 at 319.) And he testified to how the flag caused him to fear for his safety. (*Id.* at 306.) A reasonable jury considering Sommerville's complaints and testimony could determine he subjectively found his work environment abusive. *Cf. Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1248–49 (11th Cir. 2004) (looking to a plaintiff's deposition testimony to weigh element four's subjective component).

Now to the objective component. This component considers the harassment's frequency, its severity, whether the harassment is physically threatening or humiliating, and whether the harassment unreasonably interfered with the plaintiff's job performance. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (citing *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997)).

*Jones v. UPS Ground Freight* explained how and why the Confederate flag may add to a work environment's objective hostility. 683 F.3d 1283 (11th Cir. 2012). In *Jones*, an African-American truck driver submitted evidence of harassing comments and harassing activity by coworkers. One coworker allegedly told him, "I know how to train you Indians." *Id.* at 1288. When the driver explained he wasn't an Indian, the coworker replied, "I don't care what race you are, I trained your kind before." *Id.* The driver regularly found banana peels on his truck, and he saw at least three coworkers wear the Confederate flag at work. *Id.* at 1289. The driver eventually complained to management. Soon after and with a metal crowbar in hand, two white coworkers confronted him and asked him why he "told on them"—why he complained. *Id.* at 1290. The Eleventh Circuit held the comments, the flags, the bananas, and the threatening confrontation, all taken together, was "sufficient evidence of a hostile work environment to reach a jury." *Id.* at 1299. The Confederate flag was a relevant part of that evidence, but it alone was not dispositive.

Two years after *Jones* the Eleventh Circuit decided *Adams v. Austal U.S.A., LLC*, 754 F.3d 1240 (11th Cir. 2014). *Adams* looked at thirteen separate hostile work environment claims, most of which involved the Confederate flag. How the Court handled those claims illustrates the Confederate flag's place in a hostile work environment analysis. Like in *Jones*, the *Adams* Court considered the Confederate flag to be serious and relevant evidence. But a close reading of *Adams* shows the Confederate flag, on its own, rarely creates a hostile work environment. For example, one *Adams* plaintiff saw his coworkers "wear the Confederate flag on a regular basis," saw "racist graffiti" in the men's restroom "on a daily basis," heard coworkers say "nigger," and heard about a noose left in the work breakroom. *Id.* at 1254.[3] But because that plaintiff's "exposure to the Confederate flag was not directly humiliating or threatening," and because the slur "nigger" was never directed at the plaintiff, the Court upheld a summary judgment dismissing his claim. *Id.* Another *Adams* plaintiff saw "several employees" wear apparel with the Confederate flag, saw racist graffiti in work restrooms, heard a coworker refer to black people as "monkeys," and heard another coworker threaten to "hang" and "shoot" a black person. *Id.* at 1255. Even there the Court held:

---

[3] The Court does not "explicate this vulgar language lightly, but only because its full consideration is essential to measure" whether Sommerville stated an actionable claim. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 803 (11th Cir. 2010)

> [The Plaintiff] frequently saw employees wear apparel with the Confederate flag, but his exposure to the symbol was not humiliating or threatening. The racist conversation that he overheard was isolated and not directly threatening or humiliating to him. Considering the totality of the circumstances, a reasonable jury could not find that his workplace was objectively hostile.

*Id.* Even those allegations were not objectively hostile.

Under *Jones* and *Adams*, Sommerville's allegations fall far short of harassment that would objectively alter the terms and conditions of someone's employment. Over a sixteen-month period he saw between three and six coworkers with the Confederate flag.[4] Even if this qualifies as frequent harassment, it does not qualify as severe or threatening.[5] Unlike in *Jones*, no flag-wearing coworkers confronted Sommerville with a crowbar or threatened him physically. And the non-threatening allegations were less pervasive than those alleged by the unsuccessful plaintiffs in *Adams.* Sommerville never heard coworkers use racial slurs, he never saw racist graffiti, and he never saw or heard about a noose on company property. Like the unsuccessful *Adams* plaintiffs and unlike the successful *Jones* plaintiff, he alleges

---

[4] Sommerville's only other "evidence" of a hostile work environment is that employees "mistreat[ed] him" by "closely observing him to try and catch him doing something wrong." (Doc. 43 at 30.) He does not explain how "close observation" is race-based harassment. *See generally Reeves*, 594 F.3d at 803–04 (considering only alleged harassment that was based on the plaintiff's protected characteristic).

[5] Even if Sommerville found the flag threatening and severe—which he may well have—"the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).

non-threatening, non-humiliating displays of the Confederate flag. Those allegations do not rise to the level of a hostile work environment.

Because Sommerville's allegations are neither severe nor threatening nor humiliating, no reasonable jury could find his work environment was hostile.[6] In other words, no reasonable jury could find he satisfied element four's objective component. Summary judgment is therefore due to be granted as to this claim.

## IV.   Retaliation

Title VII's antiretaliation provision forbids an employer from "discriminating against" an employee because the employee "has opposed" unlawful employment practices or "has made a charge, testified, assisted, or participated in" a Title VII hearing, proceeding, or investigation. 42 U.S.C. § 2000e-3(a); *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020). "Retaliation claims are also

---

[6] A nonbinding case shows the distance between Sommerville's allegations and an actionable claim. *See Barrow v. Ga. Pac. Corp.*, 144 F. App'x 54 (11th Cir. 2005). In *Barrow*, an African-American employee saw the Confederate flag on coworkers' tool boxes and hard hats, saw "KKK" on a bathroom stall, and saw a noose in a coworker's locker. *Id.* at 57. One supervisor called that employee "nigger" three times in one year. *Id.* He also threatened to whip the employee's "black ass." *Id.* Another supervisor called him a "nigger" and threatened to "cut him" for looking at a white female. *Id. Even this* didn't qualify as an objectively hostile work environment:

> Although the symbols and slurs about which [the employee] complains were discriminatory and offensive, [he] has not presented evidence that the workplace was "permeated with discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment.

*Id.* at 57–58. If these allegations fell short, Sommerville's must as well.

cognizable under 42 U.S.C. § 1981 and are analyzed under the same framework as Title VII claims." *Gogel*, 967 F.3d at 1134. Sommerville's retaliation claim, brought under both Title VII and § 1981, arises under the so-called opposition clause. He opposed the Confederate flag, he says, so WMC suspended him in April 2018 and terminated him in August 2018. Although he offered no direct evidence of illegal retaliation, *cf. Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004), he may satisfy his burden with "circumstantial evidence using *McDonnell Douglas*'s burden-shifting framework." *Crawford v. Carroll*, 529 F.3d 961, 975–76 (11th Cir. 2008). Under *McDonnell Douglas*, Sommerville must first establish a prima facie case of retaliation. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Then the burden shifts to WMC to produce a "legitimate, nondiscriminatory reason" for the alleged retaliation. *Id.* This burden is "exceedingly light." *Cooper v. So. Co.*, 390 F.3d 695, 725 (11th Cir. 2004), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006). If WMC produces a legitimate, nondiscriminatory explanation, the burden shifts to Sommerville to show the explanation is a pretext for discriminatory retaliation. *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

The Court will separately analyze Sommerville's two allegations of retaliation.

A.   April 2018 Suspension

Under *McDonnell Douglas*, Sommerville bears the burden of establishing a prima facie case. For that he must show (1) he engaged in statutorily protected conduct, (2) he suffered an adverse employment action, and (3) that "there is some causal relation" between the protected conduct and the adverse action. *Alvarez v. Royal Atl. Develops., Inc.*, 610 F.3d 1253, 1268 (11th Cir. 2010) (citing *McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir. 2008)).

WMC challenges the first prima facie element. According to WMC, Sommerville never complained about a hostile work environment because his Confederate flag allegations fall below the *Adams* standard for an actionable claim. And if he never complained about a hostile work environment, then he complained only about lawful conduct. And if he complained only about lawful conduct, he never opposed an unlawful employment practice. And if he never opposed an unlawful employment practice, he never engaged in conduct protected by Title VII's opposition clause. And if he never engaged in conduct protected by Title VII's opposition clause, he never engaged in statutorily protected conduct—never satisfied the first prima facie element. The Court rejects that argument. "[A] plaintiff can establish a prima facie case of retaliation under the opposition clause of Title VII if he shows that he had a good faith, reasonable belief that the employer was

engaged in unlawful conduct." *Little v. United Tech.*, 103 F.3d 956, 960 (11th Cir. 1997). If he had a good faith, reasonable belief, he "need not prove the underlying discriminatory conduct that he opposed was actually unlawful." *Id.* Of course, if "binding precedent squarely holds that particular conduct is not an unlawful employment practice" then "an employee's contrary belief" is unreasonable and unprotected. *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008). If, for example, a male employee protests his employer's grooming policy because it prohibits men but not women from wearing long hair—even though binding Circuit precedent has "squarely held" such a policy is not discriminatory—then that conduct is unreasonable and is not protected by Title VII's opposition clause. *Harper v. Blockbuster Entertainment Corporation*, 139 F.3d 1385 (11th Cir. 1998).

Sommerville engaged in statutorily protected conduct when he complained to WMC management. A jury could find he had a good faith, reasonable belief that his complaints were in opposition to an unlawful employment practice (a hostile work environment). *Jones*, 683 F.3d at 1300–01 (explaining how the Confederate flag may contribute to a hostile work environment). Although the Eleventh Circuit has implied the flag cannot, without more, create an objectively hostile environment, that never has been "squarely held." Without such a "square" holding, this Court cannot say Sommerville's complaints were unreasonable or made in bad faith.

Because he complained reasonably and in good faith, his complaints were "statutorily protected" by Title VII's opposition clause.

Sommerville also satisfied the second and third elements of a prima facie case. His April 18, 2018, suspension was an adverse employment action because it deprived him of sixty days' pay. *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3rd Cir. 1997)) (An adverse employment action "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his status as an employee."). A reasonable jury could find a causal connection between that suspension and Sommerville's protected conduct. His final complaint came sometime in early April 2018. The suspension therefore happened within eighteen days of protected conduct. Such close temporal proximity between conduct and adverse action is enough to show the two are not "wholly unrelated," and, by showing this, Sommerville satisfied the third and final prima facie element. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) ("The burden of causation can be met by showing close temporal proximity between the statutorily protected conduct and the adverse employment action."); *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th

Cir. 1999) (even seven weeks between a complaint and an adverse employment action is "sufficiently proximate to create a causal nexus" between the two).

Because Sommerville established a prima facie case, the burden shifts to WMC to produce a legitimate, nondiscriminatory explanation for the sixty-day suspension. *Lewis v. City of Union, Ga.*, 918 F.3d 1213, 1221 (11th Cir. 2019). Again, this suspension came after Sommerville allegedly rammed a coworker's bulldozer. Frederickson offered the following explanation:

> Mr. Sommerville's actions placed himself, his coworkers, and company property in serious danger. His actions had the potential to injure—if not kill—Mr. Wright or himself.

(Doc. 37-1 at 8.) This explanation satisfies WMC's "exceedingly light" burden, so the burden again shifts to Sommerville to show the explanation is pretext and that discriminatory retaliation was WMC's true motivation. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("[A] reason cannot be proved to be 'a pretext for discrimination' unless it shown *both* that the reason was false, *and* that discrimination was the reason reason.") (emphasis in original).

Sommerville offers no evidence from which a reasonable jury could find WMC's explanation—that it suspended him because he endangered a coworker's safety and damaged company property—was pretext for retaliation. He makes two arguments. First, he argues WMC management "totally ignor[ed] their progressive

discipline policy" and over-punished him for the bulldozer incident. *But see Kidd v. Mando American Corp.*, 731 F.3d 1196, 1211 n.18 (11th Cir. 2013) (violation of a company policy does not show the employer acted with discriminatory intent).[7] Second, he calls Wright's version of events "extremely suspicious" and cites the arbitrator's findings. *But see Nix. V. WLCY Radio/Rahall* Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984) ("While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination."). These arguments neither persuade the Court that discriminatory retaliation motivated WMC's decision nor rebut WMC's nondiscriminatory explanation. Neither argument supports a claim of illegal retaliation.

### B.   August 2018 Termination

Sommerville argues WMC terminated him in retaliation for his Confederate flag complaints; his argument fails because he did not establish a prima facie case. He engaged in statutorily protected conduct when he complained about coworkers displaying the Confederate flag, and no one disputes his termination was an adverse

---

[7] According to Sterling's unrebutted testimony, WMC's progressive discipline policy is discretionary. "Every situation is different," she says, and every discipline action "depends on the situation." (Doc. 37-8 at 23.) If WMC's disciplinary policy is advisory and not binding—and Sommerville gave the Court no reason to doubt Sterling's testimony—then no evidence suggests WMC violated that when it suspended Sommerville.

employment action. *See, e.g., Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). The problem is element three. No evidence shows his protected conduct was causally related to his termination. Unlike the April 2018 suspension—where less than three weeks separated protected conduct from adverse action—here Sommerville cannot shoulder his causation burden through temporal proximity alone. More than four months separated his final complaint from his termination, and a "four month disparity between the statutorily protected conduct expression and the adverse employment action" is not close enough, on its own, to show the two are causally related. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). Because Sommerville put forth no other causation evidence, his prima facie case fails under element three.

Even if he established a prima facie case (which he didn't), WMC produced a nondiscriminatory explanation for his termination. It terminated him because he violated company policies against unsafe conduct when he stepped "in front of Wright's moving car for a second time" in two weeks. (Doc. 36 at 28.) Sommerville denies those allegations, but WMC's burden is merely one of production, not persuasion. *Watkins v. Sverdrup Tech., Inc.*, 153 F.3d 1308, 1314 (11th Cir. 1998).

Sommerville's claim also fails under the third *McDonnell Douglas* step. Once an employer offers legitimate reasons for alleged wrongdoing, the burden shifts back

to the plaintiff to produce evidence that the employer's proffered reasons are a pretext for retaliation. *Alvarez*, 610 F.3d at 1264. A plaintiff shows pretext "either directly be persuading the Court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Kragor v. Takeda Pharms. AM., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012). If the defendant's explanation "is one that might motivate a reasonable employer, [an employee] . . . must meet it head on and rebut it" by "producing sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered." *Wilson*, 376 F.3d at 1088.

All three of Sommerville's pretext arguments fail. He first argues Wright's allegations "cannot be substantiated." In other words, WMC's unsafe-conduct explanation rests on an erroneous assumption: that Sommerville twice walked in front of Wright's vehicle. But an employer "may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as [the firing] is not for an unlawful reason." *Jefferson v. Sewon Am, Inc.*, 891 F.3d 911, 924 (11th Cir. 2018) (quoting *Nix*, 738 F.2d at 1187). Perhaps WMC's decision to believe Wright's allegations was incorrect; that does not mean the decision was retaliatory. The second pretext argument—that WMC violated its discipline policy by terminating Sommerville instead of suspending him—also falls short. Even if WMC

violated its policy—which is something not at all clear from the record—a violated policy does not necessarily indicate retaliation. *See Springer v. Convergys Customer Mgmt. Grp., Inc.*, 509 F.3d 1344, 1350 (11th Cir. 2007) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995) ("The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decisions were pretextual."). His third and final pretext argument looks to two white employees:

> Two white employees, Richard Gentles and Christopher McCoy were involved in a verbal altercation which soon turned physical when McCoy walked over, placed his arm around Gentles' neck and yanked him . . . Fredrickson[] did not terminate either of these two white employees but instead suspended [them].

(Doc. 43 at 41.) True enough, a plaintiff can use similarly-situated comparators to show pretext. *See Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2009). Here, however, nothing suggests how or why the two comparators are similarly situated to Sommerville. We do not know if Gentles, McCoy, and Sommerville were "subject to the same employment" policy, whether they were "under the jurisdiction of the same supervisor," or whether Gentles and McCoy "share[d] [Sommerville's] employment or disciplinary history." *Lewis*, 918 F.3d at 1227–28. Without that information, the Court cannot say whether Sommerville and

his proffered comparators were similarly situated in "all material respects"—whether they are even relevant for pretext analysis. *Id.* Because Sommerville did not establish a prima facie case, and because he did not rebut WMC's nondiscriminatory explanation, his retaliation claim fails as a matter of law. Summary judgment is due to be granted.

V.   Conclusion

The Court will enter an Order consistent with this Memorandum of Opinion.

**DONE** and **ORDERED** on December 22, 2020.

L. Scott Coogler
United States District Judge

203323